Van Cleve v. Berkey.

VAN CLEVE *et al.* v. BERKEY *et al.*; BRETTELLE *et al.*, *Appellants*.

In Banc, March 1, 1898.

1. **Corporations:** PAYMENTS OF STOCK WITH PROPERTY: ACTUAL VALUE. Property may be taken in payment of the capital stock of a corporation; but such property must be taken at a fair, just, lawful, *bona fide* valuation. The owners of such property or subscribers to such stock can not put in their property or labor at any valuation they may put upon it, but the corporation must receive in property or labor what it is reasonably worth in money. Nor is this rule relaxed by the fact that the corporators did not intend any fraud on the creditors of the corporation.

2. ———: ———: ———: PURCHASE OF STOCK BY THIRD PARTIES: NOTICE. And purchasers of such stock, knowing that the property turned over to the corporation was valueless, or had been taken as a mere speculation, will be held to a compliance with such rule to the same extent as will the original subscriber.

3. ———: ———: ———: UNPAID STOCK: LIABILITY OF STOCKHOLDER. The weight of American authority and the Constitution and statutes of Missouri concur to the effect that subscribers to the stock of a corporation are liable to its creditors to "the extent of the amount of the unpaid balance of such stock by them owned;" and that it can be shown by such creditors by evidence *aliunde* the transaction, that the property received by the corporation in exchange for its stock was not of the value placed thereon by the corporation and the subscribers at the time it was issued to them; and if it is shown that the property or thing received by the corporation was of less value than the par value of the stock, the subscriber is chargeable for the difference.

| | |
|---|---|
| 143 | 109 |
| 155 | 520 |
| 143 | 109 |
| 157 | 525 |
| d157 | 527 |
| 143 | 109 |
| 90a | 578 |
| 143 | 109 |
| 168 | ¹330 |
| 168 | ¹331 |
| 168 | ⁴331 |
| 168 | ³643 |
| 143 | 109 |
| 172 | ⁶510 |
| 173 | ¹559 |
| 173 | ¹560 |

Van Cleve v. Berkey.

4. ———: ———: ———: ———: DUTY OF STOCKHOLDER. It is the duty of the stockholder, in receiving stock from a corporation, to see that it has been paid for in money or its fair equivalent in property or other valuable thing.

5. ———: ———: ———: RIGHTS OF CREDITORS. When a corporation is sent forth into the commercial world, accredited by the stockholders as possessed, in money or its equivalent in property, of a capital equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to assume that such stock has been fully paid and to extend credit to it in the belief that the money or its equivalent in property will be forthcoming to meet his legitimate demands. Nor will such stockholder be relieved of his duty to respond to the creditor for the difference between the par value of the stock and what he actually paid for it, by the fact that he believed or had reason to believe that the property turned over by him to the company was equal to the par value of the stock received by him. (*Shickle v. Watts*, 94 Mo. 410, approved, and *Woolfolk v. January*, 131 Mo. 620, distinguished.)

6. ———: PATENT: UNPAID STOCK: CASE STATED. Defendants organized an Illinois corporation to aid an inventor in perfecting an improvement for the manufacture of flour. The invention presumably was assigned to the corporation and the corporators issued to themselves full paid, non-assessable stock to the amount of $100,000, the inventor paying nothing and the others about ten per cent of the face value of their stock. The invention proved worthless, and plaintiffs, proceeding by creditor's bill, seek in equity to charge the individual stockholders as owners of the unpaid stock, with a sum sufficient to pay their several judgments against said corporation. The appellants, who purchased certain of the stock from the subscribers with full knowledge of its fictitious value, contend that in the absence of a charge, and of affirmative proof *aliunde* the transactions, of actual fraud on the part of the corporators, the stock, as to creditors of the company, is presumed to be fully paid. The authorities are reviewed at length and it is *held* that the subscribers of the stock, and purchasers from them with knowledge, are answerable, regardless of the question of actual fraudulent intent, to such creditors to the full amount of the difference between the money actually paid by the subscribers and the par value thereof; and that such difference can be shown under an allegation in the petition that the subscribers "made no payments whatever on the shares of stock subscribed by them," and that appellants became assignees of the stock held by them with the full knowledge that the capital stock had not been paid.

*Appeal from the St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

*W. B. Thompson* for appellants.

(1) The decree in this case is based upon the *dictum* of the Supreme Court in the case of *Shickle v. Watts,* 94 Mo. 417, that the court has the right to inquire into the sale and transfer of the property received by a corporation for its stock, whether such sale and transfer is fraudulent or not; which decision has been overruled by the Supreme Court. *Woolfolk v. January,* 131 Mo. 620. (2) The transaction between the original stockholders and the corporation, whereby the corporation acquired the right to the invention of Braun for purifying and separating middlings in the manufacture of flour, if honest and straightforward and not impeached for fraud, can not be disturbed simply because the corporation has made a disadvantageous sale of its stock. *Fogg v. Blair,* 139 U. S. 118; *Clark v. Beaver,* 139 U. S. 96; *Handley v. Stutz,* 139 U. S. 117; *Streator Car Seat Co. v. Rankin,* 45 Ill. App. 226; *Whitehill v. Jacobs,* 75 Wis. 474; *Schenk·v. Andrews,* 57 N. Y. 133; *Boynton v. Andrews,* 63 N. Y. 93; *Douglas v. Ireland,* 73 N. Y. 100; *Coit v. North Carolina Gold Co.,* 119 U. S. 343; *Lake Superior Iron Co. v. Drexel,* 90 N. Y. 87; *Knowles v. Duffy,* 40 Hun. 485; *Coffin v. Ransdell,* 110 Ind. 417; *New Haven Horse Nail Co. v. Linden Spring Co.,* 142 Mass. 349. (3) In the absence of fraud the defendants, Brettelle and Dustin, were innocent purchasers of full-paid and non-assessable stock. In the absence of any arrangement constituting any fraudulent overvaluation of the patent rights sold to the corporation, Dustin and Brettelle are innocent purchasers of full-paid and non-assessable stock, which was issued to them as full-paid and non-assessable, and hence the fact that they had knowledge that the stock which they purchased had been paid for by the invention sold to the corpora-

tion would not affect their position as innocent purchasers of said stock. *Woolfolk v. January*, 131 Mo. 620.

*Frank E. Richey* and *J. L. Secor* for respondents.

(1) The capital stock of a corporation is a trust fund for the benefit of creditors, and a rigid scrutiny will be made in the interest of creditors into every transaction by which the liability is sought to be avoided. Cook on Stock and Stockholders [3 Ed.], sec. 199; *Ramsey v. Mfg. Co.*, 116 Mo. 313. (2) No device by which members of a corporation attempt to avoid stockholders' liability will be upheld. No release can be had except by fair and honest dealing for a valuable consideration. *Coleman v. Howe*, 154 Ill. 458; *Ins. Co. v. Mfg. Co.*, 97 Ill. 537; *Alling v. Wentzell*, 46 Ill. App. 562; *Bates v. Tel. Co.*, 134 Ill. 546; *Kern v. Bldg. Ass'n*, 40 Ill. App. 356. (3) Payment must be made in money or in money's worth. Beach on Private Corp., sec. 557; 2 Thompson's Corp., sec. 1606; *Garrett v. Kansas City Coal Co.*, 113 Mo. 330. (4) It is not necessary to allege fraud in cases of this kind. The expectation of the stockholders was blasted, and nothing ever having been paid for the stock then or thereafter, they became liable for the debts of the company, not on account of actual fraud, but because they issued and accepted as full paid stock, well knowing that, in fact, nothing was paid on it at the time of its issue or subsequently. *Boynton v. Hatch*, 47 N. Y. 225; *Bank v. Gallaher*, 43 Mo. App. 482; *Leucke v. Tredway*, 45 Mo. App. 507; *Boulton Carbon Co. v. Mills*, 78 Iowa, 460; *Howe v. Ill. Ag'l Works*, 46 Ill. App. 85; *Malting Co. v. Brewing Co.*, 67 N. W. Rep. 652; *Coleman v. Howe*, 154 Ill. 458. (5) If property taken in payment for stock is "practically worth-

less or is unsubstantial and shadowy in its nature, the courts will hold that there has been no payment at all," and stockholders will be held liable accordingly. 1 Cook, Stock and Stockholders [3 Ed.], sec. 46; *Leucke v. Tredway*, 45 Mo. App. 507; *Nat'l Tube Works v. Gilfillan*, 124 N. Y. 302; *Chisholm v. Forny*, 65 Iowa, 333; *Hardware Co. v. Tintic Milling Co.*, 45 P. 200; *Camden v. Stuart*, 144 U. S. 104. (6) The appellants, even though assignees of stock, are liable to the creditors even if the stock certificates bore the statement "full paid and non-assessable," for they knew, before they acquired their stock, that the statement was not true. Ill. Stat. 1872, chap. 32, sec. 8; *Shickle v. Watts*, 94 Mo. 410; *Boulton Carbon Co. v. Mills*, 78 Iowa, 460; *Close v. Sherwood*, 25 N. Y. S. 980. (7) In the case of *Woolfolk v. January*, 131 Mo. 620, the plaintiff was not either a *bona fide* creditor nor an innocent purchaser, while in the case at bar the respondents are *bona fide* creditors. (8) The law requires that the entire capital stock of the corporation shall be taken, and that its face value in some form shall find its way into the treasury of the corporation. Cook on Stock and Stockholders, sec. 199; *Ins. Co. v. Mfg. Co.*, 97 Ill. 537; *Shickle v. Watts* 94 Mo. 410; *Garrett v. Kansas City C. M. Co.*, 113 Mo. 330; *Leucke v. Tredway*, 45 Mo. App. 508. (9) No device, however plausible, though good as between stockholders, will, as against the creditors of the corporation, deprive the corporate stock of its trust character, or excuse the stockholders from payment therefor in full. *Sawyer v. Haag*, 17 Wall. 610; *Alling v. Wenzel*, 133 Ill. 264; *Upton v. Tribilcock*, 91 U. S. 45. (10) Where property is taken in payment of stock at an exaggerated estimate, a strong presumption is raised that the valuation is not in good faith and is made for a fraudulent purpose.

Cook on Stock and Stockholders, sec. 47; *Douglass v. Ireland*, 73 N. Y. 104; *Boynton v. Andrews*, 63 N. Y. 93; *Osgood v. King*, 42 Iowa, 478; *Coleman v Hill*, 154 Ill. 458. (11) Gross inadequacy of price is sufficient to put the purchaser upon inquiry and charge him with all that might have been learned by diligent investigation. *Dewitt v. Perkins*, 22 Wis. 473; *Hoppin v. Daily*, 25 Wis. 573; Wade on Law of Notice, sec. 23; Cook on Stocks and Stockholders, secs. 49, 50; *Upton v. Tribilcock*, 91 U. S. 45; Morawetz on Private Corp., sec. 195; *Jackson v. Trear*, 64 Iowa, 496.

BRACE, J.—This is a proceeding in equity in behalf of various judgment creditors of the Braun Machine Manufacturing Company against that company and the other defendants who are stockholders therein, whereby it is sought to charge the individual defendants, as the owners of unpaid stock in said corporation, with a sum sufficient to pay the several judgments of the plaintiffs remaining unpaid.

The corporation was formed under the laws of the State of Illinois, and was to have a capital of $100,000 which was subscribed by the parties in interest as follows:

| | |
|---|---|
| William F. Braun | $90,000 |
| Alfred Berkey | 2,000 |
| Solomon L. Cohen | 2,000 |
| Mayers Jacoby | 2,000 |
| Edwin Massa | 2,000 |
| Nelson G. Ziebold | 1,000 |
| Louis Lesaulmies | 1,000 |

To whom the full amount of the stock, as subscribed was issued as full paid and non-assessable; the consideration therefor being a transfer, or an agreement on the part of said Braun to transfer, to the company an invention of his for an improved process of manufacturing flour, for which he claimed to have a French patent and for which application had been

made for a United States patent.   The trial court held that such transfer was not full payment for said stock, and charged the defendants as holders of unpaid stock. From the judgment of the circuit court two of the defendants, Dustin and Bretelle, who were not original subscribers, but purchasers of stock soon after its organization, appeal.   Their counsel have kindly inserted in their brief the opinion of the learned judge who tried the case below, the following extracts from which contains a fair statement of the case, with his rulings:

Judge KLEIN says:  "The essential facts shown by the evidence are these:

"One William F. Braun, claiming to be the inventor of a valuable improvement in the manufacture of flour, and claiming to have obtained a patent on his invention from the French government, induced the defendants, Berkey, Cohen, Jacoby and Massa, and the other subscribers to the capital stock of the corporation above named, who are made defendants in the bill, but who have not been served with process, and are therefore not in court, to interest themselves in the matter; and doubtless also induced them to believe that the invention, which he claimed to have made, was of the greatest value and would revolutionize the whole milling business of the world.  He seems to have been impecunious himself, but to have had great powers of persuasion, and as a result of a number of interviews the parties named agreed to form a corporation under the laws of Illinois, with a capital of $100,000, which was subscribed by the parties above named in the proportions above stated.   It is not clear from the evidence whether the original arrangement made between Braun and these parties was to the effect that they should severally become interested in the invention itself, prior to its transfer to the corporation to be

formed, or whether the invention was to be turned over to the corporation by Braun in payment of the shares of stock subscribed by him, and that the other subscribers should contribute certain sums of money to be used in procuring a patent upon the invention in the United States, and as sort of working capital for the corporation; but it does not seem important to the court which of these two views that may be taken of the evidence is the correct one. The testimony of the defendants, who have testified in the case with relation to that matter, is extremely unsatisfactory, and it is not the fault of any of the plaintiffs that all of the books and records of this corporation have been lost, which seems to be the fact. It is quite evident from the evidence that no money was paid into the treasury of the company by any of the parties, except the small sums paid respectively by the subscribers, either upon their shares of stock or for their interest in the supposed invention, which was to be turned over to the corporation; and the evidence is extremely unsatisfactory as to what was actually done towards turning over to the corporation, or to any one for it, the invention itself. It is, however, perfectly clear from the evidence that the invention which Braun claimed he had made, never materialized into anything substantial. He seems to have been engaged for a long time in the construction of a machine according to his plans and evolving his invention, and the debts of the several plaintiffs seem to have arisen out of his attempt to manufacture the machine. Aside from the witness Putnam, who seems to have seen the plans and drawings of the invention which Braun claimed to have made, no one was called to whom the same were submitted, and the testimony of Mr. Putnam is quite clear to the effect that the invention was of no value whatever, as the

same was being embodied in the machine being made by Braun.

"The evidence shows that all of the defendants acted in good faith, so far as their actual intentions were concerned, and that none of them was moved by any actual fraudulent intent in the transaction. None of the original subscribers, however, is able to state how much money they actually advanced, either for their stock in the corporation, or 'for their interest in the invention, and the evidence satisfies the court that none of them advanced over ten per cent of the amounts respectively subscribed by them for either purpose. From this the fair and reasonable inference to be drawn is that they did not consider the invention to be worth the amount of money for which it was to be put into the corporation. They were evidently willing that Mr. Braun should have $90,000 of the capital stock of the corporation, and they were also willing, each of them, to pay in for the purpose of obtaining a patent from the government of the United States on the supposed invention of Braun and for the purpose of having a machine made, the small sums respectively paid by them; but they were not willing to advance the amount of money which they actually subscribed, and this is the strongest evidence in the case to show that they did not consider the invention to have the supposed value of $100,000. In point of fact, as the result shows, the whole matter was a mere speculation, and while the individual defendants doubtless were deceived by Braun, and gulled into the belief that they would become millionaires by investing two hundred dollars apiece in this enterprise, the court can not regard such a transaction as amounting to a payment of the shares of stock which they respectively received in this corporation.

"Assuming that the invention, for which no patent was ever obtained in the United States, is to be regarded as property, and therefore as susceptible of having a value, it does not lie in the power of persons claiming to own an invention to put any value thereon that they please, and treat the invention as the equivalent of the value they have put thereon. Where the law permits subscribers to pay for stock by labor done, or property actually received, it means that the corporation must receive in labor or property what it was reasonably worth in money. Corporations must own property for the purpose of their legitimate business, and if a man contracts to take shares in the corporation he must pay for them, to use a homely phrase, 'in meal or in malt.' He must either pay in money or in money's worth. And it is the rule laid down by the Supreme Court of this State, which the learned referee seems to have overlooked, that the property or labor turned into the corporation as payment for shares of stock must be a fair, just, lawful and needed equivalent for the money subscribed. *Shickle v. Watts*, 94 Mo. 410; *Garrett v. Kansas City Coal Mining Co.*, 113 Mo. 330. The same view is the necessary result of the decision of the court of appeals, in the case of *Leucke v. Tredway*, 45 Mo. App. 507, in which a transaction very similar to the one in this case was under consideration. . . . . . . .

"With respect to the defendants, Dustin and Brettelle, the evidence shows that they were not original subscribers, but came into the corporation very early after its organization. It also appears that they had full knowledge of the fact that the only payment which had been made to the corporation for the capital stock was the intention on the part of the inventor Braun, to turn over a patent, which he might thereafter obtain, to the corporation in payment of the capital

stock.   In such a case, the mere fact that the certifi-
cates of stock recited that the shares were full paid and
non-assessable is immaterial.   They knew that the re-
cital was untrue, and they took the shares of stock sub-
ject to the liability of the original subscriber.   They
did not buy the shares in the open market; they went
into enterprise as a speculation, and the law will not
permit them now to transfer the loss of the transaction
upon the innocent creditors who have not been paid.''

In the course of his opinion the learned judge
also cites *Howe v. Agricultural Works*, 46 Ill. App.
85; *Chisholm v. Forny*, 65 Iowa, 333; and *Boulton
Carbon Co. v. Mills*, 78 Iowa, 460, in support of his con-
clusions.

1.   Counsel for appellants, taking the opinion of
the learned trial judge as a text for his argument for a
reversal of the decree in favor of plaintiffs, in effect
concedes the facts to be as stated in the opinion and
the case thereby made; but contends that thereupon
the judgment should have been for the appellant for
the reason that it is not alleged in the petition, nor
shown by the evidence, that the stockholders, in capi-
talizing the Braun invention, or rather the agreement
to transfer the same to the corporation at the sum of
$100,000 and issuing therefor full paid, non-assessable
stock to that amount, actually intended to defraud
creditors of the corporation or purchasers of its stock—
although in point of fact that invention had not at the
time, nor ever since has had, any real, intrinsic or
market value.   In other words, the contention is that
as the corporation could receive property in payment
for its capital stock, and did in fact accept the value-
less Braun invention in full payment thereof, in the
absence of actual fraud upon the part of the corpora-
tors, charged, and affirmatively proven *aliunde* the
transaction, the appellants' stock, as to the creditors

of the corporation, was fully paid for, and they should have had judgment.

*A.* In order to determine what support is given to this proposition by the authorities it may be well, *first*, to eliminate those cases which are not in point upon the facts of this case. By this process that class of cases may be excluded from consideration in which it has been held that, in the absence of fraud as between the corporation or its representative, and its stockholders, that which they have agreed on as payment shall be treated as payment, of which *Coffin v. Ransdell*, 110 Ind. 417, cited by appellants, is an example. In this class may also be included those cases in which it is held that the same rule applies as between the stockholder and an innocent purchaser of the stock, issued as full paid and non-assessable, in good faith for value, without notice of the actual consideration paid by the subscribers therefor, of which the following are illustrations: *Phelan v. Hazard*, 5 Dill. 45; *Brant v. Ehlen*, 59 Md. 1. So also may be excluded from our consideration as not in point, those cases in which it is held that a creditor who extends credit to a corporation with actual notice of the acceptance by the corporation of property at a fixed value in full payment for its capital stock, is estopped from denying that the capital stock is fully paid, of which the following are illustrations: *Bank v. Alden*, 129 U. S. 372; *Walburn v. Chenault*, 43 Kan. 352; *Whitehill v. Jacobs*, 75 Wis. 474; *Woolfolk v. January*, 131 Mo. 620. As to the last case, however, something further will be said later on. None of these, or like cases, apply, for the reason that we have here a case in which the appellants stand in the shoes of the original subscribers by reason of the fact that they accepted their stock after due inquiry and with full knowledge of the fact that it was paid for by the Braun

invention; and the plaintiffs are simply creditors of the corporation who extended credit to it upon the faith of its capital stock. We are to inquire what is the rule between such a creditor and such a stockholder.

*B.* It seems that in all the States, either by force of statutory enactment or judicial construction, property may now be taken in payment of the capital stock of a corporation, but, as was aptly remarked by DEPUE, J., in *Wetherbee v. Baker*, 35 N. J. Eq. 501, such transactions "have been upheld only where . . . . . . . the purchase of property has been made in good faith and the property taken in payment of stock subscriptions has been put in at a fair *bona fide* valuation; and the courts have inflexibly enforced the rule that payment of stock subscriptions is good as against creditors, only where payment has been made in money or in what may fairly be considered money's worth." The soundness of this doctrine has been recognized almost universally, yet, when we come to inquire how the courts have enforced this rule, as between a creditor and a stockholder, pure and simple, we find a line of cases in which it is, or seems to be, held that where the property has been taken at a value less than the par value of the stock for which full-paid non-assessable stock is issued, in the absence of an affirmative showing of fraud, the over-valuation will not render the stockholder liable for the difference. *Bickley v. Schlag*, 46 N. J. Eq. 533; *Coit v. Gold Amalgamating Co.*, 119 U. S. 343; *Boynton v. Andrews*, 63 N. Y. 93; *Douglass v. Ireland*, 73 N. Y. 100; *Van Cott v. Van Brunt*, 82 N. Y. 535; *Lake Superior Iron Co. v. Drexel*, 90 N. Y. 87; *Gilkie & Anson Co. v. Dawson Town & Gas Co.*, 46 Neb. 333; *Kelley v. Fletcher*, 94 Tenn. 1; and in support of this doctrine we are also cited by counsel for appellant to the cases of *Fogg v. Blair*, 139 U. S. 118; *Clark v.*

*Bever*, 139 U. S. 96; and *Handley v. Stutz*, 139 U. S. 417. It is to be observed, however, in regard to all of these cases from the Supreme Court of the United States, that in the earlier cases it was held as the settled doctrine of that court that a contract, whereby property was accepted at a value less than the par value of the capital stock, in payment for its shares issued as full-paid, that "such a contract, though binding on the company, is a *fraud in law* on its creditors which they can set aside; that when their rights intervene and their claims are to be satisfied, the stockholders can be required to pay their stock in full." *Scovill v. Thayer*, 105 U. S. 154; *Sawyer v. Hoag*, 17 Wall. 610; *New Albany v. Burke*, 11 *Id.* 96; *Burke v. Smith*, 16 *Id.* 390; and that a creditor "has the right to presume that the stock subscribed has been or will be paid up, and if it is not, a court of equity will at his instance require it to be paid" (*Scovill v. Thayer*, *supra*); and in the latter case of *Camden v. Stuart*, 144 U. S. 104, it was held that "the trust arising in favor of creditors by subscriptions to the stock of a corporation can not be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith;" and it was not intended in *Clark v. Bever*, 139 U. S. 96; *Fogg v. Blair*, 139 U. S. 118, or *Handley v. Stutz*, 139 U. S. 417, to overrule "or qualify this wholesome principle adopted by this court in the earlier cases, . . . but only to draw a line beyond which the court was unwilling to go in affixing a liability upon those who had purchased stock of the corporation, or had taken it in good faith, in satisfaction of their demands;" and in the case of *Handley v. Stutz*, Justice BROWN, speaking for the court, was careful to re-assert the doctrine that the trust arising in favor of creditors by subscriptions to the stock of a corporation can not be defeated by a simulated pay-

ment of such subscription, nor by any device short of an actual payment in good faith; and in the case of *Fogg v. Blair*, Justice HARLAN, speaking for the court, announces the doctrine of that court in the following language: "It is the settled doctrine of this court, as well as of the Supreme Court of Missouri, that unpaid subscriptions to the stock of a corporation constitute a trust fund for the benefit of its creditors, which may not be given away, or disposed of without consideration, or fraudulently, to the prejudice of such creditors. *New Albany v. Burke*, 11 Wall. 99 and 106; *Sawyer v. Hoag*, 17 Wall. 610, 620; *Upton, Assignee, v. Tribilcock*, 91 U. S. 45; *Sanger v. Upton, Assignee*, 91 U. S. 56; *County of Morgan v. Allen*, 103 U. S. 498–509; *Scovill v. Thayer*, 105 U. S. 143; *Hawkins v. Glenn*, 131 U. S. 319, 335; *Richardson v. Green*, 133 U. S. 30, 45; *Peters v. Bain*, 133 U. S. 670, 691; *Clark v. Bever, ante*, 96; *Liebke v. Knapp*, 79 Mo. 22, 24. And this principle of general law is re-enforced in Missouri—where the transaction in question occurred and by whose laws the railroad corporations mentioned in the bill were created—by a statute giving a judgment creditor of a corporation, where corporate property can not be found upon which to levy his execution, the right to an execution against a stockholder 'to the extent of the amount of the unpaid balance of such stock by him or her owned.' 1 R. S. 1879, p. 121, sec. 736; *Ib.*, 1889, sec. 2517."

In regard to the *New York cases* hereinbefore cited it is only necessary to observe, so far as the facts of the case in hand are concerned, that in the more recent case of *National Tube Works Co. v. Gilfillan*, 124 N. Y. 302, it was held that: "By proof that the stock of the company has been issued as full-paid stock which has not been fully paid, a legal fraud is established. It is not necessary to show otherwise an actual fraudulent intent. So, also, if it be shown that the stock

was issued in payment for property, with knowledge on the part of the trustees that the value of the property was much less than the amount of the stock, no other fraudulent intent than that which is evidenced by the action of the trustees need be shown to authorize a recovery." The fallacy of the reasoning in *Van Cott v. Van Brunt*, is pointed out in 2 Morawetz on Corporations section 826. Advancing along this line, we come to the *Illinois cases*, under whose laws this corporation was created and by which the liabilities of its stockholders are imposed. In the recent case of *Coleman v. Howe*, 154 Ill. 458, we find the following clear exposition of the law of that State: MAGRUDER, J., speaking for the court in that case, after reviewing some of the leading cases, says: "Some of the cases hold that over-valuation will not render the stockholder liable for the difference between the actual and accepted values, unless there is affirmative proof of fraud *aliunde;* but other cases hold what we regard as the better view, namely, that, where property whose value is well known or can be easily learned is taken at an exaggerated estimate, a strong presumption is raised that the valuation is not in good faith and is made for a fraudulent purpose. This presumption will be conclusive unless rebutted by satisfactory evidence explanatory of the apparent fraud. Where the over-valuation is so great that the fraudulent intent appears on its face and is not explained, the court will hold it to be fraudulent as matter of law. . . . . . . If there is a fraudulent over-valuation of the property taken by the corporation for the stock, the stockholder is liable for the difference between the actual value and the accepted value of such property and consequently his stock is regarded as unpaid stock to the extent of that difference. Hence, proof of fraudulent over-valuation is proof that the stock is unpaid. Under the allegation that the stock is

unpaid, any proof that it is unpaid, even th ough it be proof of the unpaid difference referred to as growing out of a fraudulent over-valuation, may be legitimately introduced." That the rulings in this case are in harmony with previous cases in that State, see *Union Ins. Co. v. Frear Stone Mfg. Co.*, 97 Ill. 537; *Nat'l Bank of America v. Pacific R'y Co.*, 66 Ill. App. 320; *Howe v. Ill. Agr'l Works*, 46 Ill. App. 85; *Alling v. Wenzell*, 27 Ill. App. 511. In this last case it was held "that an acceptance of property of imaginary value as full payment for one third of the stock does not relieve the holders of it from the obligation to bear with the other, but subsequent subscribers, who had no notice of the transaction, the burden of the debts of the company." The charge in the petition in the case at hand is that the subscribers "made no payments whatever on the shares of stock subscribed by them" and that appellants became assignees of the stock held by them with full knowledge that the capital stock had not been paid for. The proof was that the capital stock was paid for only by an agreement to turn over to the corporation the worthless Braun invention, and any patent that might be obtained therefor, and that the defendants had full knowledge of that fact. In such circumstances it would seem that under the ruling of the Supreme Court of Illinois in these cases, the appellants would be charged as holders of unpaid stock in an action like unto this; and it is beyond question that they might be so held, regardless of the question of actual fraudulent intent under the ruling of the court of appeals of New York in *Boynton v. Hatch*, 47 N. Y. 225, and *Nat. Tube Works v. Gilfillan, supra*; under the rulings of the Supreme Court of *Ohio* (*Gates v. Tippecanoe Stone Co.* (1897) 48 N. E. Rep. 285); and of the Supreme Court of *Minnesota* (*Hastings Malting Co. v. Iron Range Brew-*

*ing Co.*, 65 Minn 28; *Hospes v. Northwestern Co.*, 48 Minn. 174); of *Washington* (*Manhattan Trust Co. v. Seattle Coal Co.*, 16 Wash. 499; *Adamant Man. Co. v. Wallace*, 16 Wash. 614); of *Utah* (*Henderson v. Turngren*, 9 Utah, 432; *Salt Lake Hardware Co. v. Tintic Milling Co.*, 13 Utah, 423); of *Alabama* (*Elyton Land Co. v. Birmingham, etc., Co.*, 92 Ala. 407); and of *Iowa* (*Osgood & Moss v. King*, 42 Iowa, 478; *Chisholm Bros. v. Forny*, 65 Iowa, 333; *Boulton Carbon Co. v. Mills*, 78 Iowa, 460). In the case of *Chisholm v. Forny*—quite analagous to the one in hand—the Supreme Court of Iowa said: "In the present case the appellants believed the patent to be valuable, but in fact it was worthless. It was not and could not be made available for the purpose of paying the indebtedness of the corporation. In payment for the stock issued to them by the corporation, the defendants transferred to it their interest in this worthless patent. It seems to us, as was said in *Osgood v. King*, 42 Iowa, 478, that it would 'be a reproach to the law' if, under these circumstances, the appellants are not individually liable to the creditors of the corporation to the extent of their subscription to the capital stock." It is not probable, however, that in any jurisdiction in the United States the law would be subjected to such a reproach, for as said by Mr. Cook: "If the property which is turned in is practically worthless, or is unsubstantial and shadowy in its nature, the courts will hold that there has been no payment at all, and the stockholders liable on the stock." Cook on Stocks and Stockholders [3 Ed.], sec. 46, and authorities cited in note 1.

Satisfied that the weight of American authority outside of this jurisdiction is against the appellants' contention on the facts of this case and that they would thereby be held liable, as by the court below,

without other proof of fraud than was afforded by the transaction itself, we will now turn to the law of Missouri, without further notice of the many cases we have examined from other jurisdictions. By the Constitution of 1875, article XII, section 8, it is provided that "no corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void." By statute it is provided that "the stock or bonds of a corporation shall be issued only for money paid or property actually received" (R. S. 1879, sec. 727; R. S. 1889, sec. 2499); and that "if any execution shall have been issued against any corporation and there can not be found any property or effects whereon to levy the same, then such execution may be issued against any of the stockholders to the extent of the amount of the unpaid balance of such stock by him or her owned" (R. S. 1879, sec. 736; R. S. 1889, sec. 2517); and that "if any company, formed under this chapter, dissolve, leaving debts unpaid, suits may be brought against any person or persons who were stockholders at the time of such dissolution without joining the company in such suit" R. S. 1879, sec. 745; R. S. 1889, sec. 2519.

Mr. Cook, the author, from whom we have just quoted, after treating of the law as it stood under the adjudications of the courts at the time this legislation was first enacted, says: "Hence, when it became clear that the common law did not prevent the issue of watered stock, but compelled the public to rely not upon statements of the capital stock, but upon an investigation of the actual condition of the company, a demand arose for statutes and constitutional provisions to protect the people from watered stock. This demand gave rise to certain constitutional provisions which have been enacted in several States. These

provisions are very similar in their wording and are substantially as follows: ' 'No corporation shall issue stocks or bonds except for money, labor done or money or property actually received, and all fictitious increase of stock or indebtedness shall be void.' It is now twenty years since the first of these provisions was enacted, and yet it may be said that these constitutional provisions have decidedly failed to remedy the evil they were expected to cure.'' Sec. 47.

In the recent case of *Elyton Land Co. v. Birmingham Warehouse & Elevator Co.*, 92 Ala. 423, in an able opinion, after an extended review of the authorities, WALKER, J., speaking for the court, says: ''Our examination satisfies us that the weight of American authority does not support the statement made by Mr. Cook, in section 47 of his work on *Stocks and Stockholders*, to the effect that the attempts which have been made, in cases where stock was issued for property taken at an over-valuation, to hold the party receiving such stock liable for its full par value, less the actual value of the property received from him, have been unsuccessful; and that if there has been an over-valuation which is shown to have been fraudulent, then the contract is to be treated like other fraudulent contracts, and is to be adopted *in toto*, or rescinded *in toto* and set aside. We have found no authority at all asserting the exemption of the stockholder from such liability where it appeared that the stock subscription was governed by a statutory regulation at all similar to section 1805 of the Code of 1876, or section 1662 of the code of 1886. On the other hand, the New York, New Jersey, Maryland and Pennsylvania decisions which have been cited show that the courts in those States, in giving effect to statutory requirements, certainly no more stringent than ours, as to the mode in which stock subscriptions shall be made payable, do

not allow attempted payments in property worth greatly less than the amount of stock issued therefor to foreclose the just demands of corporate creditors to require that the stock subscriptions be made good in money or in money's worth as contemplated by the statutes. Those courts recognize in such provisions safeguards intended for the protection of persons dealing with corporations as well as for the corporations themselves and the persons associated together therein.

Our general laws afford the amplest and freest facilities for persons desiring to engage in almost any kind of lawful venture to secure by corporate association the advantages of defined and limited responsibility and at the same time the efficient execution of their purposes by means of an artificial being, changes in the membership of which cause no break in the continuity of its action, nor affect its capacity to act, within the scope of its powers, as a natural person. It is plain that such associations, endowed with such powers and privileges, would be a source of danger to persons dealing with them, unless the law required that in their formation suitable provisions be made for a substantial responsibility for such engagements as they may enter into. When legal provisions are found which are appropriately framed to secure the existence of such responsibility it is not permissible so to construe them as to allow a mere formal and illusory compliance therewith to defeat the objects intended to be accomplished. No argument is needed to show that a requirement that the stock of a corporation shall be paid in money, or in labor or property at its money value, inures to the benefit of persons who may become creditors of the corporation, in that it requires the capital stock to be the representative of substantial values

and insure the existence of a fund which must be within reach for the satisfaction of debts if the affairs of the corporation are managed as contemplated by the law. It is equally clear that if a stock subscription which is required to be made payable in money, or in labor or property at its money value, and is in fact made payable in property at a designated money valuation, may be satisfied by the transfer of property the value of which is insignificant or merely nominal as compared with the valuation stated, then, so far as this provision of the law looks to the protection of creditors, it might as well have allowed subscription to be made payable in "chips and whetstones."

The Missouri cases decided since the adoption of our present Constitution and the enactment of the statutes aforesaid, give no countenance to the idea that these provisions have failed of their purpose in this State. In the first of these cases, decided by the St. Louis Court of Appeals in 1879 (*Chouteau v. Dean*, 7 Mo. App. 210), it was held that "where $10,-000 of stock is issued by a corporation to an officer thereof in consideration of services rendered by him, valued at $2,500—the stock being taken at its market value of twenty-five per cent — such officer thereby becomes a stockholder and as such liable to creditors of the corporation to the extent of the difference between the value of his services and the par value of the stock." In the next case, decided by this court in 1880, it was held that "the capital paid in and promised to be paid in, is a fund which the trustees can not squander or give away." *Gill v. Balis*, 72 Mo. 424; which was followed in *Chouteau Ins. Co. v. Floyd*, 74 Mo. 286, decided in 1881. In the next case—*Kehlor v. Lademann*, 11 Mo. App. 550—decided by the St. Louis Court of Appeals in 1882, "in a direct proceeding by the creditor of a corporation to recover against a stock-

holder an amount alleged to be due and unpaid upon his stock, in satisfaction of plaintiff's claim against the corporation," it was held that where stock was issued of the par value of $34,000 in payment of a debt of only $33,955.45, that a balance of $44.55 was as yet due and unpaid on the stock, for which plaintiff was awarded judgment.    In the next case, *Liebke v. Knapp*, 79 Mo. 22, decided by this court in 1883, which was on motion for execution under the provisions of the statute, it was held that where the services rendered for capital stock under a contract with the corporation were equal in value to the par value of the stock issued therefor, such stock was thereby paid for.    In the next case, *Shickle v. Watts*, 94 Mo. 410, decided by this court in 1887, which was a suit by a judgment creditor against a stockholder of an Illinois corporation in the nature of a creditor's bill, as in the case in hand, in which it was alleged that the defendant was the owner and holder of a large number of the shares of the stock of the company, subscribed and issued to him and on which no payment whatever was made, it was held "that where an agreement is entered into between a contractor and a corporation whereby the former is to perform work for or furnish material to the latter and to take unpaid stock in part or in full payment, that such contractor, whether for labor or material, can only charge therefor the reasonable market value for such labor thus given in exchange; and that all agreement by the corporation to pay more than such reasonable compensation will be disregarded and held for naught by the courts when the rights of creditors intervene.    And this is the case, even though no fraud is proven;" and it was accordingly so ruled in the judgment in that case.

In the next case, *Farmers Bank of Frankfort v. Gallaher*, 43 Mo. App. 482, decided by the Kansas City

Court of Appeals in 1890, in an action under section 745, *supra*, against a stockholder of a defunct corporation, it was held that, "To hold the defendant liable it is only necessary to allege and prove, *first*, that the plaintiff is an unsatisfied creditor of the defunct corporation and, *second*, that defendant, at the dissolution of said corporation, was the holder of stock therein not fully paid up."

In the next case, *Leucke v. Tredway*, decided in 1891 by the St. Louis Court of Appeals, which was another case of a creditor of an insolvent Illinois corporation suing a holder of its stock by purchase at one fourth of its par value, said stock being originally paid for by transfer of a patent right, capitalized at $500,000, but which the court found "had no substantial market or other value at the time of the transaction, but that whatever value it had was conjectural and problematical, depending upon what might be done with it under proper management," upon an allegation in the petition "that ninety-five per cent upon said stock remains unpaid," the stockholder was held liable, THOMPSON, J., who delivered the opinion of the court, stating the law as follows: "The general rule of law is that it is beyond the power of a corporation to issue its stock at less than its par value, and that where it does so issue its shares, the taker of them is liable in a proceeding by or on behalf of creditors, to make good the difference between their par value and what he actually gives for them (citing authorities); if an exception to this rule is claimed in any particular case the party claiming the exception must put his hand upon some statute authorizing the corporation to so deal with its shares. As no statute of Illinois has been proved authorizing a corporation to issue its shares for less than their par value in money, we conclude that the law of Illinois in this respect is the

same as the law of Missouri and the general law; and we are confirmed in this conclusion by an examination of a decision of the Supreme Court of that State. *Union Mutual Life Ins. Co. v. Frear, Etc., Co.*, 97 Ill. 537."

In the next case, *Garrett v. Kansas City Coal Mining Co.*, 113 Mo. 330, decided by this court in 1892, which was a suit for specific performance of a contract to exchange lands for the capital stock of a corporation, it was said: "When the Constitution permits a subscriber to pay for stock by labor done or property actually received, it means that the corporation must receive, in labor or property, what it was reasonably worth in money. The same rule obtains in the absence of statutory authority. Corporations must own property for the purposes of their legitimate business, and it would be but a useless formality to receive the money in payment for the stock and return it again in payment of the property. That formality is not required, but as is said by LORD JUSTICE GIFFARD in *Drummond's* case, 4 Ch. App.: 'If a man contracts to take shares he must pay for them, to use a homely phrase, 'in meal or in malt;' he must either pay in money or in money's worth.' Cook on Stockholders, sec. 13; 1 Morawetz on Private Corporations, sec. 428. To the same effect are the decisions in this State. The property or labor must be a 'fair, just, lawful and needed equivalent for the money subscribed.' *Liebke v. Knapp*, 79 Mo. 24; *Shickle v. Watts*, 94 Mo. 414; *Chouteau v. Dean*, 7 Mo. App. 210."

In the next case, *Ramsey v. Thompson Mfg. Co.*, 116 Mo. 313, decided by Division No. 2 of this Court in 1893, which was an action to recover back land and money paid on subscription to the capital stock procured by fraudulent misrepresentations, it was said: "That the capital stock of a corporation, both

that which has been actually paid and subscriptions thereto which remain unpaid, are ordinarily regarded in law as a trust fund, pledged for the payment of the debts of the corporation, there can be no question. *Foster v. Planing Mill Co.*, 92 Mo. 79; *Adler v. Brick Mfg. Co.*, 13 Wis. 57. Nor can a corporation make an arrangement with any of its stockholders by which they are to be released from the payment of their stock subscribed, or any part thereof, so as to affect the rights of its creditors. This has been so held by this court. *Insurance Co. v. Floyd*, 74 Mo. 286; *Gill v. Balis*, 72 Mo. 424; *Upton v. Tribilcock*, 91 U. S. 45.''

In the next case, *Shepard v. Drake*, 61 Mo. App. 134, decided by the Kansas City Court of Appeals, and which was a proceeding by motion under section 2517, Revised Statutes 1889, it was held that: ''It is now the well settled doctrine in this State that while the stock of a corporation may be paid for in money, labor or property of any kind used in the business, yet such stock will not, as to the corporation creditors, be deemed fully paid unless such money, labor or property shall at the time be the fair equivalent of the stock's par value. In other words, mere fictitious values placed on labor or property in payment for stock will be ignored and the shareholder will get credit on his subscription for the real value of the labor or property, nothing more, and be compelled at the suit of a corporation creditor to pay up the balance. And this rule seems to seems to hold in this State, whether the over-valuation of the property received by the corporation be the result of fraud, mistaken estimate or bad judgment.''

In the next and last case, *Woolfolk v. January*, 131 Mo. 620, decided by Division No. 2 of this Court December 17, 1895, and upon which appellants mainly rely for a reversal of the judgment in this case,

and which was a proceeding by motion for execution against a stockholder by purchase from an original stockholder, upon an allegation that the defendant's stock was wholly unpaid for; and in which it appeared from the evidence that the plaintiff was a judgment creditor on bonds issued by the corporation in part payment of a gas plant in the city of Nevada, which plant and its franchise had been accepted by the company at a valuation equal to the par value of the stock in full payment of its capital stock and said bonds; and in which the court found, upon the admission of plaintiff himself, that he purchased the bonds with full knowledge of the transaction; it was held that the plaintiff was estopped from claiming that defendant's stock was not fully paid up.  This is the full scope of the decision upon the facts in judgment in that case. The ruling is in harmony and entirely consistent with the rulings in all the cases in this State which we have cited and affords no support to plaintiff's contention. In fact "the boot is on the other leg," for here it is the appellants who accepted their stock with full knowledge that it had been paid for only by the agreement to transfer a hoped for patent in the worthless Braun invention and who, upon the same principle, should be estopped from claiming that their stock was thereby fully paid for in an action by a creditor who, without notice, extended credit to the corporation upon the faith of its capital stock being fully paid as required by law.

Upon a review of all the cases decided by the appellate courts of this State since the adoption of the Constitution of 1875, the ruling in all of which will be found to be in harmony, it is impossible to escape the conviction that in this State, whatever may be the case in some of the other States, the American Trust Doctrine, as suggested by MR. JUSTICE HARLAN, has

indeed been "reinforced" by its Constitution and Statutes; and that the proposition that the stock of a corporation must be paid for "in meal or in malt," in money or in money's value, is not a mere figure of speech, but really has the significance of its terms. It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent, in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid and that the money or its equivalent in property will be forthcoming to respond to his legitimate demands. In short, that it is the duty of the stockholder, and not of the creditor, to see that it is so paid; hence, the inquiry in a case between the creditor and a stockholder when property has been paid in for the capital stock of a corporation, is not whether the stockholder believed or had reason to believe that the property was equal in value to the par value of the capital stock; but whether, in point of fact, it was such equivalent. This wholesome and salutary doctrine, beneficial alike to the general public and to all corporations doing business with *bona fide* capital, so firmly applied in *Shickle v. Watts, supra,* and so well formulated in the foregoing quotation from the opinion of GILL, J., in the case of *Shepard v. Drake, supra,* ought not to be in any way weakened or impaired by anything said in the opinion in the case of *Woolfolk v. January,* in criticism of a single expression in the opinion in *Shickle v. Watts,* and which criticism was *obiter* to the case then in hand.

Applying this doctrine to the facts of the case now under consideration the appellants are obviously left without a single shred of claim to a reversal of the judgment of the circuit court, which is therefore affirmed. All concur.